UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

LORETTA MEYER,                         )
(Social Security No. XXX-XX-7268),     )
                                       )
                    Plaintiff,         )
                                       )
            v.                         )         3:06-cv-88-RLY-WGH
                                       )
MICHAEL J. ASTRUE, Commissioner        )
of  Social Security,[1]                )
                                       )
                    Defendant.         )

**MEMORANDUM  DECISION AND ORDER**

**I.  Statement of the Case**

Plaintiff, Loretta Meyer, seeks judicial review of the final decision of the agency,

which found her not disabled and, therefore, not entitled to Disability Insurance Benefits

("DIB") under the Social Security Act ("the Act").  42 U.S.C. §§ 416(i), 423(d); 20

C.F.R. § 404.1520(f).  The court has jurisdiction over this action pursuant to 42 U.S.C. §

405(g).

Plaintiff applied for DIB on April 23, 2003, alleging disability since March 11,

2003.  (R. 52-54).  The agency denied Plaintiff's application both initially and on

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Michael J. Astrue, in his official
capacity only, is substituted as the Defendant in this action.

reconsideration.  (R. 24-32).  Plaintiff appeared and testified at a hearing before Administrative Law Judge Marsha Stroup ("ALJ") on February 1, 2005.  (R. 237-73). Plaintiff was represented by an attorney; also testifying was a vocational expert ("VE"). (R. 237).  On July 6, 2005, the ALJ issued her opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy.  (R. 15-21).  The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner.  (R. 4-6).  20 C.F.R. §§ 404.955(a), 404.981.  Plaintiff then filed a Complaint on May 26, 2006, seeking judicial review of the ALJ's decision.

## II.  Medical Evidence

In March 2001, Plaintiff saw Michael Love, M.D., for shoulder pain.  (R. 110). She reported that her diabetes was controlled with diet.  (R. 110).  Dr. Love noted that range of motion in Plaintiff's left shoulder was limited and impingement testing was positive.  (R. 110).  Neurological signs were unremarkable.  (R. 110).  He gave Plaintiff a steroid injection and prescribed non-steroidal anti-inflammatory medications and physical therapy.  (R. 110).  Plaintiff did not return to Dr. Love again for 21 months until December 2002.  (R. 109).

Plaintiff saw J. W. Collier, M.D., for a variety of complaints from August 2002 to October 2003.  (R. 112-27).  In September 2002, she reported that she was going to be receiving fertility shots soon and needed to have her blood sugar levels monitored.  (R.

120).  Dr. Collier periodically adjusted Plaintiff's insulin dosages in response to her recorded blood sugar levels.  (R. 116-19).

In November 2002, Dr. Collier reported that Plaintiff's blood sugar levels needed to be controlled better and recommended that she see a diabetic specialist.  (R. 114). Plaintiff requested that Dr. Collier complete "disability forms" because she "missed a lot of work due to diabetes."  (R. 115).

When Plaintiff saw Dr. Love in December 2002, she complained of left hip pain. (R. 109).  Plaintiff walked without a limp and left hip rotation was painful, but only at the extremes.  (R. 109).  Plaintiff's neurological function was unremarkable.  (R. 109).  A December 2002 magnetic resonance imaging ("MRI") study of Plaintiff's hips was unremarkable.  (R. 108, 111).

Later in December 2002, Dr. Love administered a steroid injection in Plaintiff's left hip.  (R. 107).  When he examined Plaintiff several days later, she reported that the steroid injection "completely" resolved her symptoms, but the injection caused an elevation in her blood sugar levels.  (R. 106, 218).  She walked without limping and rotation of the hip was well tolerated.  (R. 106, 218).  Dr. Love released Plaintiff to return to work on January 6, 2003.  (R. 112).

In March 2003, Plaintiff consulted Philip Behn, M.D., regarding her diabetes given that it was complicated by her fertility treatments.  (R. 131-37).  Plaintiff reported that her blood sugar levels tended to remain over 250 milligrams per deciliter (mg/dl).  (R. 132). She also reported that she had never experienced a severe hypoglycemic episode, but had

3

some mild episodes before she started steroid therapy for fertility.  (R. 132).  She had no

history of retinopathy, neuropathy or nephropathy.  (R. 132).  Physical examination was

unremarkable.  (R. 132).

Plaintiff ultimately became pregnant through in vitro fertilization.  (R. 201).  In

April 2003, Plaintiff was referred to obstetrician Ana Spence, M.D., because her

pregnancy was deemed high risk due to her age and her insulin dependent diabetes.  (R.

158).  Dr. Spence helped Plaintiff obtain an insulin pump and throughout the remainder of

her pregnancy monitored her blood sugar levels and adjusted her insulin dosage.  (R. 157,

161-209).

In June 2003, another obstetrician, Terry R. Brown, M.D., wrote a letter stating

that during Plaintiff's pregnancy she should not lift more than 25 pounds and that she

needed to check her blood sugar levels every two hours.  (R. 200).  He opined that after

she recovered from her pregnancy she should be able to "return to more normal

work-type schedule.  She will not have to be as careful with her blood sugars . . . ."  (R.

200).

In July 2003, Richard P. Gardner, M.D., examined Plaintiff at the request of the

state agency.  (R. 151-54).  Plaintiff told Dr. Gardner that she quit her job earlier that year

because her diabetes was poorly controlled.  (R. 151).  Plaintiff reported that her blood

sugar levels remained erratic.  (R. 151).  She also stated she was 28 weeks pregnant.  (R.

151).  She complained of painful feet and reported that her weight had increased

approximately sixty-three pounds since she became pregnant.  (R. 151).  She had painful

4

range of motion in her left hip. (R. 151). Dr. Gardner noted that Plaintiff was obese, range of motion was decreased in her lumbar spine, and Plaintiff was able to ambulate normally. (R. 152). Although sensation to touch was decreased in her feet and ankles, her vibratory sensation and position sense was intact in her lower extremities. (R. 152). Dr. Gardner opined that Plaintiff's painful feet were likely due to peripheral neuropathy. (R. 152).

In November 2003, state agency physician J. Sands, M.D., reviewed the medical evidence of record and opined that Plaintiff's physical impairment was not severe. (R. 105).

In January and February 2004, Plaintiff visited Dr. Love for complaints of hip and right shoulder pain caused by an automobile accident that occurred in September 2003. (R. 216-17). Dr. Love noted that Plaintiff had tenderness and mild crepitation (creaking in the joint) in her shoulder. (R. 216-17). Abduction of Plaintiff's hips caused discomfort at the extremes. (R. 216). An x-ray of Plaintiff's right shoulder was unremarkable with the exception of some excess tissue. (R. 217). An MRI study was negative. (R. 219). Dr. Love gave Plaintiff a steroid injection in her shoulder and recommended home exercises to promote rotator cuff strengthening. (R. 217).

In March 2004, Plaintiff saw JoAnn Smart, M.D., for the second time since she began seeking treatment with her in October 2003. (R. 211-12). Claiming that she was disabled due to hip pain, Plaintiff asked Dr. Smart to complete disability forms. (R. 212). Dr. Smart reviewed Plaintiff's medical records and noted that MRI studies and x-rays

were negative and indicated that she could not identify the etiology of Plaintiff's reported pain. (R. 214). Dr. Smart also stated that Plaintiff "most likely will no[t] qualify for disability." (R. 215). Dr. Smart administered a steroid injection to Plaintiff's right shoulder in April 2004. (R. 220). She also performed an injection arthrogram on Plaintiff's hips. (R. 220). In October 2004, Plaintiff complained to Dr. Smart of foot pain, depression, left leg pain and anxiety, but Dr. Smart did not note any clinical findings. (R. 226).

In March 2005, clinical psychologist Richard T. Karkut, Psy.D., examined Plaintiff at the request of the Social Security Administration. (R. 227-34). Plaintiff told Dr. Karkut that she lived with her husband and 17-month old son. (R. 227). She had been in special education classes and had an eighth grade education. (R. 227). Plaintiff had good grooming and hygiene and established a good rapport with Dr. Karkut. (R. 227). When asked if she had learned from her diabetes management class, Plaintiff reported that she learned what she could and could not eat and learned to calculate carbohydrates and how to adjust her insulin dosage. (R. 228). Her husband reported that she played with and took care of the baby, but that she could not be on her feet long enough to cook. (R. 228). Her husband also reported that she could not read very well. (R. 228). Plaintiff's husband recounted her job history and stated that she worked at an electronics company that made piano keyboards until the company closed. (R. 228). He stated that Plaintiff left her next job at a woodworking company because she had difficulty reading a ruler and left another inspecting job because she made mistakes. (R. 228). She left a discount

6

store position because "somebody was picking on her there."  (R. 228).  She returned to the electronics company at a different location and worked until she was laid off.  (R. 228).

Intelligence tests resulted in the following scores:  full scale IQ 69; performance IQ 72; and verbal IQ 72.  (R. 227).  Dr. Karkut concluded that Plaintiff's scores indicated borderline intellectual functioning because she could cook, balance meals, wash clothes and care for her baby without apparent difficulties due to developmental delay.  (R. 229). He also noted that she could calibrate her insulin and adjust her diet to meet her diabetic needs.  (R. 229).  He assigned a global assessment of functioning (GAF) score of 70, indicating some mild symptoms.  (R. 229).  He concluded that she would have no difficulties understanding, carrying out or remembering short, simple instructions, but that she would have moderate difficulties understanding, carrying out and remembering detailed instructions due to her borderline intellect.  (R. 232).

**Plaintiff's School Records:**

Plaintiff's school records indicated that in 1980, she obtained the following scores on an unidentified "intelligence" test: verbal IQ, 60; quantitative IQ, 71; nonverbal IQ, 65.  (R. 90).  1975 and 1976 Otis Lennon Primary Cognitive Abilities Test results indicated an IQ score of 90.  (R. 90).  Plaintiff was retained in first grade and in sixth grade.  (R. 91).  Her grade reports indicated that her grades varied widely from year to year.  (R. 91).  She was enrolled in special education classes for math and language arts in seventh and eighth grades.  (R. 95).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility.  *Richardson,* 402 U.S. at 399-400.  Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits.  *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential

five step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V. The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through the date of her decision, and Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (R. 20). The ALJ continued by finding that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had five impairments that are classified as severe: diabetes mellitus, peripheral neuropathy, hip and shoulder pain, and borderline intellectual functioning. (R. 20). The ALJ concluded that this impairment did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 21). Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her limitations were not fully credible. (R. 21). Consequently, the ALJ concluded that Plaintiff retained the RFC to: (1) lift and carry ten pounds frequently and 20 pounds occasionally; (2) sit at least six

hours in an eight-hour workday; (3) stand and walk for six hours in an eight-hour

workday; (3) occasionally perform overhand work with her right arm; (4) have no

climbing of stairs or ladders and no exposure to fumes or other irritants; and (5) perform

work at SVP 1 or 2.  (R. 21).  The ALJ determined that Plaintiff could perform her past

work in electronics assembly.  (R. 21).  The ALJ concluded by finding that Plaintiff was

not under a disability.  (R. 21).

## VI.  Issues

The court concludes that Plaintiff has essentially raised four issues.  The issues are

as follows:

1.  Whether the ALJ improperly concluded that Plaintiff did not meet Listing

12.05.

2.  Whether the ALJ's credibility determination was adequate.

3.  Whether the ALJ's treatment of Dr. Brown's opinion was improper.

4.  Whether the ALJ's RFC assessment was proper.

**Issue 1:**      **Whether the ALJ improperly concluded that Plaintiff did not meet
              Listing 12.05.**

Plaintiff's first concern with the ALJ's opinion is that the ALJ failed to conclude

that Plaintiff's learning impairment met Listing 12.05.  That particular listing provides as

follows:

> 12.05 Mental retardation:  Mental retardation refers to significantly
> subaverage general intellectual functioning with deficits in adaptive
> functioning initially manifested during the developmental period; i.e., the

evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A.  Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

Or

B.  A valid verbal, performance, or full scale IQ of 59 or less;

Or

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Or

D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpart P, Appendix 1.  In the introduction to Listing 12.00 for

Mental Disorders, 20 C.F.R. Part 404, Subpart P, Appendix 1, further provides that

Listing 12.05 for Mental Retardation is different from the other listings.  In order to meet

Listing 12.05, an individual's impairment must first satisfy the diagnostic description in

11

12.05's introductory paragraph and must then meet one of the four sets of criteria listed in sections A, B, C and D.  *Id.*

Plaintiff found fault in the ALJ's conclusion that "she does not have deficits of adaptive functioning manifested prior to age 22. . . ."  (R. 18).  However, we need not address whether Plaintiff's mental impairment met this "diagnostic description" of mental retardation, as there was substantial evidence to support the ALJ's conclusion that Plaintiff's impairment does not meet any of the four sets of criteria also required by Listing 12.05.  The only recent intelligence testing performed on Plaintiff was conducted by Dr. Karkut and revealed a full scale IQ score of 69, performance IQ of 72, and verbal IQ of 72.  (R. 227).  These scores indicate that Plaintiff did not meet the criteria of section A as she was able to be tested; Plaintiff also did not meet the criteria for section B because none of her IQ scores fell below 60.  Hence, the only two relevant criteria are sections C and D.

Plaintiff's full scale IQ of 69 did barely place her within the confines of section C. However, the introduction to Listing 12.00 explains that standardized test scores are only part of the overall assessment of an individual's intelligence, and it is important to examine any reports that coincide with the test scores.  20 C.F.R Part 404, Subpart P, Appendix 1.  In this instance, Dr. Karkut's report that accompanied these test scores concluded that plaintiff's daily activities (including the ability to calibrate her insulin, adjust her diet, and take care of her baby) as well as the overall cluster of her intelligence scores demonstrated borderline intellectual functioning.  (R. 229).  This was substantial

evidence to demonstrate that Plaintiff did not meet the C criteria of Listing 12.05.

Additionally, Dr. Karkut opined that Plaintiff only suffered from "moderate"

impairments, not the type of "marked" impairments included within the D criteria of

Listing 12.05.  There is, therefore, substantial evidence to support the ALJ's finding that

Plaintiff's impairment did not meet or substantially equal Listing 12.05, as none of four

criteria listed in sections A, B, C, or D were met.

**Issue 2:       Whether the ALJ's credibility determination was adequate.**

Plaintiff next argues that the ALJ's credibility determination was improper because

the ALJ failed to take into consideration Plaintiff's various medications.  The Seventh

Circuit has noted that an ALJ's credibility determination will not be overturned unless it

is "patently wrong."  *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000).  However,

whether the decision is wrong depends upon how closely the ALJ follows SSR 96-7p, the

regulation promulgated by the Secretary to assess and report credibility issues.  SSR 96-

7p states that there is a two-step process that the ALJ engages in when determining an

individual's credibility:

> First, the adjudicator must consider whether there is an underlying
> medically determinable physical or mental impairment(s)--i.e., an
> impairment(s) that can be shown by medically acceptable clinical and
> laboratory diagnostic techniques--that could reasonably be expected to
> produce the individual's pain or other symptoms.  The finding that an
> individual's impairment(s) could reasonably be expected to produce the
> individual's pain or other symptoms does not involve a determination as to
> the intensity, persistence, or functionally limiting effects of the individual's
> symptoms.  If there is no medically determinable physical or mental
> impairment(s), or if there is a medically determinable physical or mental
> impairment(s) but the impairment(s) could not reasonably be expected to

13

produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.* This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

Social Security Ruling 96-7p (emphasis added). SSR 96-7p further provides that the

ALJ's decision regarding the claimant's credibility "must contain specific reasons for the

finding on credibility, supported by the evidence in the case record, and must be

sufficiently specific to make clear to the individual and to any subsequent reviewers the

weight the adjudicator gave to the individual's statements and the reasons for that

weight." *Id.* Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's

subjective individual symptoms, such as pain, are considered, several factors are relevant

including:  (1) the individual's daily activities; (2) the location, duration, frequency and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3)(i)-(vii).

The ALJ's evaluation of Plaintiff's credibility is found at R. 18-19 and reads as follows:

> The claimant testified she is able to read short paragraphs, but unable to make change.  The claimant testified she stopped work due to bad blood sugar levels, and took family leave.  She has received both short term and long term disability payments.  The claimant testified her diabetes is out of control, even with an insulin pump.  She stated it goes up to 500.  She stated she did not have any emergency room or hospital treatment in 2004.  The claimant testified her blood sugar has fallen as low as 17.  She stated she has had neuropathy in her feet for one and one-half years, and is on Neurontin.  She stated it helps some, but she cannot stand to have her feet touched.  The claimant testified she has arthritis in her hip and right shoulder causing pain.  She stated steroid shots make her blood sugar go up, and she has not had one in four to five months.  She stated she is in pain all of the time, and is unable to step into her clothes or raise her right arm over her head.  She stated she has asthma, but it is under control.

> The claimant testified she can sit 25 minutes at a time, and can only walk as far as the distance from her house to her car.  She stated she cannot lift "anything," but is able to lift her child, who weighs 31 pounds, and can lift a gallon of milk with her left hand.  She stated her husband does all

15

housework, and her mother takes care of the baby.  She stated she needs help showering, and needs help with her hair.

I find the claimant's testimony to be exaggerated and inconsistent with the other evidence of record.  The claimant stopped work during her pregnancy, which was high risk.  However, although the claimant testified she stopped work due to high blood sugar problems, records from Dr. Spence show her blood sugar levels had stabilized by the time she stopped working.  The claimant has not sought any emergency treatment, and does not go to her doctor frequently.  She has never complained of syncope or near syncope.  Furthermore, her husband told Dr. Karkuk that both of them were laid off from Kimball Electronics.  This is evidence that the claimant was not forced to stay off of work due to her health.  Although the claimant testified to significant neuropathy, and that she is able to walk only very short distances, there is no evidence to support the allegation.  The claimant does have neuropathy, but the record does not document any difficulties with ambulation, or abnormalities in gait or station.  The claimant's shoulder and hip pain is mild on examination, and her hip pain occurs only at the extremes of range of motion testing, which is not at all consistent with her testimony.  Although the claimant testified she cannot lift "anything," she can lift a 31-pound child.  She cares for her child, which does take effort.  Although the claimant testified she naps twice daily for two hours at a time, this does not appear to be caused by any impairment.  There is nothing in the evidence to suggest the claimant would need help showering, and she has never made mention of such severe limitations to her primary care physician.  It appears that the claimant has chosen to remain off work in order to stay home with her child.  Given the lack of evidence to support the claimant's allegations, the evidence that contradicts her allegations, the contradictions in her testimony, the discrepancies in her alleged onset and her work activity, and that she apparently left work due to her pregnancy, I find her testimony to be not credible.

(R. 18-19).  The ALJ, in this instance, certainly conducted a very thorough examination

of Plaintiff's credibility taking into consideration many of the factors required by 20

C.F.R. § 404.1529.  The court concludes that the ALJ engaged in a reasonable assessment

of the contradictions in Plaintiff's testimony as well as the disconnect between Plaintiff's

testimony about her hip and shoulder pain and neuropathy and the objective medical

16

evidence that simply does not reveal limitations as severe as Plaintiff claims.  However, the ALJ erred when she failed to discuss Plaintiff's medications and their side effects. Section 404.1529 explicitly states that the side effects of medication must be examined within an ALJ's credibility determination.  Plaintiff testified that she took two two-hour naps a day, and the ALJ rejected this testimony explaining that "this does not appear to be caused by any impairment."  (R. 19).  In rejecting this testimony, the ALJ never discussed Plaintiff's testimony that she took six Lortabs a day which made her sleepy, her testimony that she took Neurontin which made her sleepy, and her testimony that she took Gabotentine which made her sleepy.  (R. 228, 254, 260).  The ALJ's credibility assessment, therefore, failed to address one aspect of the credibility determination that may be material to a decision in this case.  On remand the ALJ must evaluate Plaintiff's credibility concerning her use of these medications.

**Issue 3:        Whether the ALJ's treatment of Dr. Brown's opinion was improper.**

Plaintiff also argued that the ALJ made two errors with regard to Dr. Brown's opinion.  Plaintiff claims that the ALJ should have recontacted Dr. Brown and that the ALJ should have given Dr. Brown's opinion greater weight.  Dr. Brown's opinion can be found at page 200 of the Record.  He clearly and unequivocally stated that, during her pregnancy, Plaintiff

> needs to check her blood sugar every two hours during the day.  This severely limits the amount of time she can continuously work at any job. . . .  I feel that after the pregnancy is completed and she is recovered that she should be able to return to [a] more normal work-type schedule.  She will not need to be as careful with her blood sugars, but while she is pregnant it

17

is important that she keep her blood sugars in a very strict range to provide optimal benefit to the fetus.

(R. 200).  This language leaves no doubt that Dr. Brown was only providing an opinion about Plaintiff's limitations *during her pregnancy*.  This language did not require the ALJ to recontact Dr. Brown for any clarification.  Additionally, this opinion is limited to Plaintiff's pregnancy.  Therefore, because Dr. Brown's opinions were confined to Plaintiff's pregnancy, they were not entitled to controlling weight.

**Issue 4:       Whether the ALJ's RFC assessment was proper.**

Plaintiff's final argument was that the ALJ's RFC assessment was improper.  Specifically, Plaintiff claims that the ALJ provided no evidence to support her findings concerning Plaintiff's RFC.  This is simply not accurate.  The ALJ provided significant support for her RFC assessment at pages 16-17 of the Record.  The ALJ took into consideration plaintiff's complaints of shoulder pain and concluded that Plaintiff should engage in only occasional overhead work with her right arm.  The ALJ also took into consideration Plaintiff's borderline intellectual functioning and limited her to only jobs in the SVP 1 and 2 categories.  The ALJ also limited Plaintiff to no climbing of stairs or ladders, taking into consideration Plaintiff's complaints of hip pain.  Additionally, the ALJ took into consideration Plaintiff's asthma and excluded jobs that involved exposure to pollutants or extreme temperatures.  Finally, the ALJ's finding which limits Plaintiff to lifting 20 pounds occasionally and ten pounds frequently is in line with the opinions of Dr. Brown.  There was no medical evidence that Plaintiff's obesity or hip impairment

18

provided any more significant restrictions to her RFC.  Hence, the ALJ's RFC assesment

is supported by substantial evidence and is **AFFIRMED.**

## VII.  Conclusion

There is substantial evidence to support the ALJ's determination that Plaintiff did

not meet Listing 12.05.  And, the ALJ did not improperly evaluate the opinions of Dr.

Brown.  The ALJ's RFC assessment is also supported by substantial evidence.  However,

the ALJ's credibility determination did not take into consideration Plaintiff's claims of

extreme fatigue as a result of the medications she was taking.  The final decision of the

Commissioner is, therefore, **REMANDED** for the sole purpose of examining Plaintiff's

credibility.

**SO ORDERED** the 2nd day of August 2007.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

J. Michael Woods
WOODS & WOODS
mwoods@woodslawyers.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov